FILED
United States Court of Appeals
Tenth Circuit

**January 30, 2009**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CHARLES TAYLOR,

       Petitioner-Appellant,

v.

RANDALL G. WORKMAN, Warden,
Oklahoma State Penitentiary,[*]

       Respondent-Appellee.

No. 07-7030

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
(D.C. NO. CIV-01-252-JHP-KEW)**

---

Randy A. Bauman, Assistant Federal Public Defender (James A. Drummond, Assistant Federal Public Defender, with him on the briefs), Oklahoma City, Oklahoma for Petitioner-Appellant.

Robert L. Whittaker, Assistant Attorney General (W.A. Drew Edmondson, Attorney General of Oklahoma Criminal Division, with him on the brief), Oklahoma City, Oklahoma, for Respondent-Appellee.

---

Before **KELLY**, **McCONNELL**, and **GORSUCH**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

[*] Pursuant to Fed. R. App. P. 43(c)(2), Randall G. Workman is substituted as Warden for Marty Sirmons.

In a drug-related incident, Petitioner-Appellant Charles Taylor shot four people, one of whom died. The prosecution introduced evidence that Mr. Taylor made statements at the time indicating an intention to kill two of the shooting victims who survived the incident. Mr. Taylor denied that he had any intention to kill the victim who died, whom he did not even know. Rather, he testified that he shot this victim while firing his weapon wildly as he attempted to flee the scene. An Oklahoma jury convicted Mr. Taylor of one count of first degree murder and three counts of shooting with intent to kill. He was sentenced to death on the first degree murder conviction.

The trial court determined that Mr. Taylor was entitled to receive a lesser-included offense instruction of second degree murder on the shooting death, but provided the jury an instruction that—all parties now agree—was legally defective. The Oklahoma Court of Criminal Appeals ("OCCA") upheld the conviction, notwithstanding the defective instruction, because it concluded that the error was harmless. It reasoned that the evidence did not support the necessity of a lesser-included-offense instruction at all; therefore, it determined that the defective character of the instruction did not result in a violation of Mr. Taylor's constitutional rights.

Mr. Taylor filed a petition in federal district court for a writ of habeas corpus under 28 U.S.C. § 2254, raising a number of grounds for relief. The district court denied relief, and Mr. Taylor appealed to this court. We hold,

contrary to the district court and the OCCA, that Mr. Taylor was constitutionally entitled at trial to a correct jury instruction on the lesser-included offense of second-degree murder and that the error was not harmless. *See Beck v. Alabama*, 447 U.S. 625 (1980). Because we conclude that the OCCA's decision on this point was "contrary to . . . clearly established federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), we reverse the district court's denial of Mr. Taylor's petition for habeas relief on his first degree murder conviction, making it unnecessary to reach his other arguments.

## I. Background

Our account of the facts of this case is largely based on the OCCA's opinion in *Taylor v. State*, 998 P.2d 1225 (Okla. Crim. App. 2000) ("*Taylor II*"). We presume the state court's factual findings to be correct unless the petitioner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## A. The Crime

In mid-October 1995, Mr. Taylor and Shelia Pelz, his girlfriend, sold a pouch of methamphetamine paste to Steven Verner, a friend of Mr. Taylor, for $1700. Mr. Verner paid Mr. Taylor $400 up front and agreed to pay the balance of the money due after he sold the drugs. After this transaction, Mr. Taylor and Ms. Pelz stayed with Mr. Verner at his home for roughly a week and, according to Mr. Verner, "[d]id a lot of drugs" together. At the end of that week, Mr. Verner

was able to pay Mr. Taylor an additional $400. Mr. Verner also gave Mr. Taylor a nine millimeter pistol to hold as collateral.

Mr. Taylor attempted to collect on Mr. Verner's remaining debt several times, but with no success. The prosecution presented evidence that on November 4, 1995, the day of the shooting, Mr. Taylor saw a friend, Frankie Oss, and "told Oss that he was going to collect his money from Verner, otherwise he might shoot Verner with his own gun if he did not pay." *Taylor II*, 998 P.2d at 1228. Mr. Oss testified that he did not take this comment seriously, but cautioned Mr. Taylor about spending the rest of his life in the penitentiary. Mr. Taylor and Ms. Pelz then spent the day with Steve Armstrong, another friend to whom Mr. Verner owed money for methamphetamine. Mr. Armstrong testified that over the course of nine hours, Mr. Taylor, he, and two others consumed a twelve-pack of beer. After leaving Mr. Armstrong's home with Ms. Pelz, Mr. Taylor returned briefly to get something he had forgotten. Mr. Armstrong testified that Mr. Taylor then told him that he (Taylor) "was going to 'cap the son of a bitch (Verner) so that bitch (Pelz) would shut up and leave him alone.'" *Taylor II*, 998 P.2d at 1229.

Mr. Taylor and Ms. Pelz went to Mr. Verner's home later that night. At the home were Mr. Verner, Verner's daughter Lindsay, Lindsay's friend Adrianne Smith, and Michael Sauer, a friend of Mr. Verner. Mr. Taylor did not know either Michael Sauer or Adrianne Smith. Lindsay knew Mr. Taylor from when he

stayed at Mr. Verner's home.  Mr. Taylor brought with him Mr. Verner's pistol, which he had loaded with ammunition approximately a week earlier.

While Ms. Pelz waited in the car, Mr. Verner took Mr. Taylor into his home, where they "visited a little bit."  Tr. II 419.  During this time, Mr. Sauer was watching television in the living room, while Lindsay and Adrianne went to chat with Ms. Pelz in the car outside.  Eventually, Mr. Verner offered Taylor food and they went together into the kitchen.  There, Mr. Verner acknowledged that he owed Mr. Taylor money and promised to repay him, but told Taylor that he did not have the money at that moment.  Mr. Verner testified that Mr. Taylor told him "that wasn't good enough," looked like he was going to cry, and said "I'm worried about it's down to the point of being or not being."   Verner reached out to console him and asked, "You mean to tell me they're going to kill you over eight hundred dollars,"[**] or something to that effect.  According to Mr. Verner, after he said this and put his hand on Taylor's shoulder, Taylor pushed Verner away.  Mr. Taylor reached for the loaded pistol and shot Mr. Verner in the face.

After being shot, Mr. Verner heard two more shots and thought that Taylor had committed suicide in the next room.   In fact, Mr. Taylor had shot Michael

----

[**]The OCCA recorded Mr. Verner as saying "You mean to tell me that they're going to kill *me* over $800.00?"  *Taylor II*, 998 P.2d at 1229 (emphasis added).  Mr. Verner's testimony unambiguously indicates, however, that he asked Mr. Taylor about whether "they" were going to kill Mr. Taylor, not himself.  *See* Trans. II 421–22.  This is also consistent with Mr. Taylor's testimony that he himself "owed" for the drugs, and needed Mr. Verner's help to come "talk to the guy [he] owed or something . . . or get [the debt] off [his] back."  Tr. III 600.

Sauer–twice. Taylor then proceeded out of the house and encountered Lindsay Verner, who had left the vehicle and was attempting to run inside. She saw Mr. Taylor waving a pistol and testified that she heard him say "I hope you die, bitch," before shooting her in the side of the head. Adrianne Smith saw Taylor shoot Lindsay and attempted to aid her friend; Mr. Taylor shot Ms. Smith twice. Taylor then got into Ms. Pelz's vehicle and drove away.

Mr. Taylor's testimony mostly accorded with Mr. Verner's account, but disputed some facts and provided additional color as to his actions and alleged state of mind on the day of the shooting. As the OCCA summarized:

> Appellant testified at trial that before he went to Verner's home, he had consumed alcohol and methamphetamine.[***] He admitted having Verner's loaded gun inside his shirt when he knocked on the door, but said he was going to return it upon payment of the money. He also testified when Verner reached out towards him, he became scared, pushed him back, pulled out the gun from within his shirt, and shot him in the face.
> He stated that when Verner grabbed his face and fell to the ground, he flipped out and started running towards the door. While running through the living room, Appellant saw movement out of the corner of his eyes and fired twice in the direction of the movement. Outside, he saw two more people running towards him screaming and just started shooting in their direction. He then got into Pelz's car and drove off. Pelz asked him what had happened, but Appellant said he could not remember.
> Appellant could not explain why it scared him when Verner put his arm around him. Further, he could not remember telling Lindsay that he hoped she died. Appellant testified he did not aim as

---

[***]Specifically, Mr. Taylor testified that he took "crank" (methamphetamine) intravenously three or four times that day. In addition, he testified that he had also drank whiskey and used pot that day.

he shot, but the gun was just flailing around and he was shooting it at anyone running towards him.

*Taylor II*, 998 P.2d at 1229 (¶ 11–13).

Mr. Taylor did not remember telling Frankie Oss that "he was going to kill Verner with his own gun." *Id.* He did, however, remember telling Steve Armstrong something to the effect of "somebody needs to put a cap in [Mr. Verner]."

After the shootings, Mr. Sauer called 911 to report the incident and ask for help. Steven Verner, Lindsay Verner, and Adrianne Smith survived their wounds. Michael Sauer did not.

## B. Trial Proceedings

Mr. Taylor was tried over four days before a jury in Pittsburg County, Oklahoma. The defense focused primarily on the theory that Mr. Taylor lacked the premeditated intent necessary to support a first degree murder conviction for the killing of Michael Sauer. The only defense witness was Mr. Taylor himself, whose testimony was summarized above. The prosecution argued that Mr. Taylor had gone to the Verner home with the intention of killing Steven Verner if he did not pay the methamphetamine debt, and that, having shot Verner, Mr. Taylor then intentionally killed, or attempted to kill, the others in order to eliminate witnesses.

After closing arguments, the prosecution and defense jointly prepared the jury instructions and reviewed them with the court the next day, outside of the jury's presence. As regarded the shooting of Michael Sauer, the jury was instructed on first and second degree depraved mind murder, as well as voluntary intoxication as a defense to first degree murder. The instructions indicated that in order to meet its burden of proof on the first degree murder charge, the state had to prove beyond a reasonable doubt that the defendant had the specific criminal intent to kill Michael Sauer. Jury Instruction 9. To prove second degree murder, the jury was required to find that the defendant caused Mr. Sauer's death by "conduct which was imminently dangerous to [an]other person . . . evinc[ing] a depraved mind in extreme disregard of human life," but which was "not done with the intention of taking the life of or harming any particular individual." Jury Instruction 17. The jury was instructed further that if the state failed to sustain its burden because of the defendant's intoxication, it must find the defendant not guilty of first degree murder. Jury Instruction 27. As regarded the shootings of Stephen Verner, Lindsay Verner, and Adrianne Smith, the jury was instructed on the charge of shooting with intent to kill and the lesser-included offense of assault and battery with a dangerous weapon. Jury Instructions 31–33.

The jury found Mr. Taylor guilty of the first degree murder of Michael Sauer, and of three counts of shooting with intent to kill—corresponding to Steven Verner, Lindsay Verner, and Adrianne Smith. The jury sentenced him to

life on each of the latter three counts. The jury then proceeded to a penalty phase on the first degree murder charge.

During this proceeding, the defense called one witness, Dr. Bill Sharp, a clinical psychologist with particular expertise in drug and alcohol addiction, to present mitigating testimony. Although several family members, co-workers, and friends had expressed a willingness to testify, counsel chose not to call any of them. On direct examination, Dr. Sharp testified that Mr. Taylor had a long history of drug and alcohol abuse. He also opined that Mr. Taylor's repeated methamphetamine use on the day of the shooting resulted in Mr. Taylor entering a state of acute amphetamine intoxication. Dr. Sharp explained that when individuals enter such a state, they "go past paranoia into a very intense state of aggression and suspicion . . . . 'Their behavior is violent and in short they're a walking time bomb.'" *Taylor II*, 998 P.2d at 1237. He also testified that consuming whiskey and amphetamines can "cause[] people suffering from these effects to have an extra sensitive startle response or reflex." *Id.* Dr. Sharp concluded by characterizing Mr. Taylor as feeling "guilty and full of remorse, and as not having been competent when he committed the crime." *Id.*

The jury deliberated for roughly five hours. At one point during deliberations, the jury foreman submitted a note stating "we are deadlocked at eleven to one." The judge submitted an Oklahoma Uniform Jury Instruction informing the jurors that if they were unable to agree unanimously as to

-9-

punishment, the judge would discharge them and impose a sentence of imprisonment for life without parole. The jury eventually came to consensus. It found the existence of two aggravating circumstances: 1) the defendant knowingly created a great risk of death to more than one person; and 2) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution. The jury proceeded to sentence Mr. Taylor to death.

## C. Post-Trial Proceedings

On direct appeal, represented by new counsel, Mr. Taylor filed an application for an evidentiary hearing in connection with his claim of ineffective assistance of counsel at the guilt and penalty phases of the trial. *See Taylor v. State*, 972 P.2d 864, 864 (Okla. Crim. App. 1998) ("*Taylor I*"). The OCCA found clear and convincing evidence that there was a strong possibility that trial counsel was ineffective in two respects: 1) failure to hire Dr. Sharp earlier in his trial preparation and to use Dr. Sharp effectively in developing his trial strategy; 2) failure to adequately prepare Mr. Taylor for trial and failure to call second stage mitigation witnesses. *Id.* at 865–66. It therefore remanded for an evidentiary hearing on these issues. *Id.* at 867. After the evidentiary hearing in February 1999, the trial court issued findings of fact and conclusions of law on April 28, 1999. The trial court found that trial counsel's reasons for trying the case as he did amounted to sound trial strategy.

The OCCA affirmed Mr. Taylor's conviction for first degree murder and his capital sentence, rejecting his ineffective assistance claims and several additional legal claims not pertinent here. Of particular relevance, the OCCA rejected Mr. Taylor's claim that he was entitled to a proper lesser-included instruction on second degree murder. Although recognizing that Mr. Taylor received an erroneous instruction, the OCCA considered the error harmless because it concluded that Mr. Taylor was not entitled to a second degree murder instruction in the first place. The OCCA concluded that because the facts "suggest[ed] a design to effect the death of Sauer," the facts were indicative of first degree murder and "therefore [did] not support a second degree murder instruction." *Taylor II*, 998 P.2d at 1231.

Mr. Taylor filed a petition for certiorari in the United States Supreme Court. The Court denied that petition on February 20, 2001. *Taylor v. Oklahoma*, 531 U.S. 1157 (2001). He also applied for post-conviction relief to the OCCA, which was denied as well. *Taylor v. State*, No. PC-98-738, slip op. (Okla. Crim. App. July 17, 2000). His next step was to file the current action, a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, in the United States District Court for the Eastern District for Oklahoma. The district court denied his petition, *Taylor v. Sirmons*, No. CIV-01-252-JHP-KEW, 2007 WL 778043 (E.D. Okla. Mar. 12, 2007). Like the OCCA, the district court rejected Mr. Taylor's assertion that he was entitled to a lesser-included instruction, albeit on alternative

-11-

grounds to the OCCA's rationale. It found that a *Beck* instruction on second degree murder was not warranted, believing that second degree depraved mind murder was not a lesser-included offense of first degree murder under Oklahoma law. In addition, it found that Mr. Taylor was not entitled to a second degree murder instruction on a voluntary intoxication theory.

The district court granted a certificate of appealability (COA) as to two issues: 1) ineffective assistance of counsel in the penalty phase and 2) the adequacy of lesser-included instructions at the guilt stage. Circuit Judge Porfilio expanded the certificate to include an additional three issues: 3) ineffective assistance of counsel at the guilt stage; 4) the propriety of victim impact statements introduced during the penalty phase; and 5) the adequacy of the court's response and instruction as to the meaning of "life without parole." Because we conclude that Mr. Taylor was entitled to habeas relief on the lesser-included offense instruction, we do not reach or discuss any of the other issues on which COA was granted.

**II. Mr. Taylor's Claim to an Adequate Lesser-Included Instruction**

In *Beck v. Alabama*, 447 U.S. 625, 627 (1980), the Supreme Court held that a death sentence cannot constitutionally be imposed unless the jury is permitted to consider a verdict of guilt as to a lesser-included non-capital offense, provided that the evidence would support such a verdict. *Id.* at 627. Without such an instruction, the Court reasoned, defendants would be subject to a heightened risk

-12-

of erroneous conviction if juries were presented only with the stark choice either to convict a defendant of a capital offense or set him free.

> [W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.
>
> Such a risk cannot be tolerated in a case in which the defendant's life is at stake.

*Id.* at 637. Accordingly, the denial of a proper lesser-included non-capital instruction, when warranted by the evidence, violates due process by "diminish[ing] the reliability of the guilt determination." *Id.* at 638.

In this case, Mr. Taylor received a second-degree murder instruction. As the OCCA acknowledged, however, the instruction given was erroneous under Oklahoma law. *See Taylor II*, 998 P.2d at 1231. The jury was instructed that to establish second-degree murder, the state must prove five elements: 1) the death of a human; 2) caused by conduct which was imminently dangerous to the other person(s); 3) the conduct was that of the defendant; 4) the conduct evinced a depraved mind in extreme disregard of human life; 5) the conduct is not done with the intention of taking the life of *or harming* any particular individual. Jury Instruction 17 (emphasis added). The words "or harming" should not have been included. *Taylor II*, 998 P.2d at 1231. Under Oklahoma law, "the existence of an intent to harm a particular individual should not preclude a conviction" for second

degree depraved mind murder. *Willingham v. State*, 947 P.2d 1074, 1081 (Okla. Crim. App. 1997) (overruled on other grounds by *Shrum v. State*, 991 P.2d 1032, 1036 n.8 (Okla. Crim. App. 1999)).[****]

Nevertheless, the OCCA found this error harmless because it determined that Mr. Taylor was not entitled to a correct second-degree murder instruction in the first place. *See Taylor II*, 998 P.2d at 1231. Similarly, the district court concluded that Mr. Taylor was not entitled to a second-degree murder instruction, albeit for different reasons. *Taylor v. Sirmons*, No. CIV-01-252-JHP-KEW, 2007 WL 778043, at *25–27 (E.D. Okla. Mar. 12, 2007).

Our analysis will proceed as follows. First we will address the OCCA's harmless error analysis, concluding that it was contrary to clearly established federal law. Then we will turn to the district court's alternative arguments for why the error was harmless, rejecting these on de novo review. Finally, we will analyze the evidence in this case de novo, apply the test for harmless error set

---

[****]For a short period of time, including during Mr. Taylor's trial, Oklahoma courts were mistakenly directed to include the "or harming" language in second degree murder jury instructions. *See Palmer v. State*, 871 P.2d 429, 432 (Okla. Crim. App. 1994). As the OCCA noted three years later in *Willingham,* though, this represented an unwarranted departure from Oklahoma law and misstated the appropriate requirements of statutory second-degree murder in Oklahoma. *See Willingham*, 947 P.2d at 1080–81,1081 n.6 (overruling *Palmer*). In this appeal, the State does not contest the OCCA's finding of error in Mr. Taylor's instruction. Any argument it might have had on this basis has therefore been waived. *Cf. Turrentine v. Mullin*, 390 F.3d 1181, 1194 n.1 (10th Cir. 2004) (citing *Abercrombie v. City of Catoosa, Okl.*, 896 F.2d 1228, 1231 (10th Cir. 1990) (failure to argue issue in appellate brief or at oral argument constitutes waiver).

forth in *Brecht v. Abrahamson*, 507 U.S. 619, 629–31 (1993), and conclude that the defective instruction had a "substantial and injurious effect . . . in determining the jury's verdict." *Id.* at 631

### A. The OCCA's rationale for finding the errant instruction harmless

The OCCA concluded that Mr. Taylor's errant instruction was harmless on the ground that a second degree murder instruction was unnecessary under the facts of this case. It reasoned as follows: "Appellant testified that as he ran through the living room, he saw movement out of the corner of his eyes and fired in that direction twice, killing Sauer. These facts suggest a design to effect the death of Sauer and *therefore* do not support a second degree murder instruction." *Taylor II*, 998 P.2d at 1231 (emphasis added).

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1–2).

-15-

A state court decision is "contrary" to clearly established law "if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court decision is an "unreasonable application" of clearly established law when the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (citing *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). The OCCA reached the merits of Mr. Taylor's objection to the defective lesser-included offense instruction, but its analysis of harmlessness was contrary to clearly established federal law, as set forth by the Supreme Court in *Beck*. We therefore do not defer to the OCCA's ruling.

The OCCA erred by assuming that if the evidence "suggested" a finding of first degree murder, it "therefore" did not "support a second degree murder instruction." *Taylor II*, 998 P.2d at 1231. This is inconsistent with the inquiry demanded by *Beck*. Under *Beck*, courts are not directed to evaluate the evidence to determine whether it would support a first degree murder conviction, or even whether a conviction for first degree murder or a lesser-included offense is better supported. As the Supreme Court noted in *Hopper v. Evans*, "the jury must be permitted to consider a verdict of guilt of a noncapital offense 'in every case' in which 'the evidence would have supported such a verdict,'" 456 U.S. 605, 610

-16-

(1982) (citation omitted), not just in those cases where the court believes the lesser verdict would be most consistent with the evidence. If the evidence would support a verdict of either first degree murder or second degree murder, the jury must be allowed to make the choice. The effect of the OCCA's contrary approach is to deny the defendant the benefit of the second-degree murder instruction in precisely the circumstance where it is most important: where the evidence would support conviction for first degree murder but would also support conviction on the lesser-included offense.

In *Hogan v. Gibson*, 197 F.3d 1297 (10th Cir. 1999), this court reviewed a capital conviction in which the state appellate court had upheld denial of a lesser-included offense instruction on the ground that the evidence was consistent with conviction for first degree murder. We found this approach "squarely contrary to the holding of *Beck*," *id*. at 1305, and therefore found that the state court ruling was not entitled to deference under AEDPA. *See id*. at 1306. Indeed, the error made by the OCCA in that case was essentially the same as that made here. *Compare Hogan v. State*, 877 P.2d 1157, 1160 (Okla. Crim. App. 1994) (OCCA concluded that lesser-included instruction was unwarranted because the facts "show a clear design to effect the victim's death in a cold and calculated manner") *with Taylor II*, 998 P.2d at 1231 (OCCA reached same conclusion because "the[] facts suggest a design to effect the death of Sauer").

The proper inquiry is whether the defendant presented sufficient evidence to "allow a jury to rationally conclude" that the defendant was guilty of the lesser-included offense. *Hogan*, 197 F.3d at 1308. In Mr. Taylor's case, the court should have determined whether the evidence presented at trial was sufficient to allow the jury to find that the defendant shot at Mr. Sauer without intending to kill him. Because the OCCA's analysis here, as in *Hogan*, was "contrary to clearly established federal law, as set forth by the Supreme Court," we cannot defer to its conclusion that no lesser-included offense instruction was required.

**B.     The district court's rationale for finding the errant instruction harmless**

The district court also concluded that Mr. Taylor was not entitled to an instruction on second-degree murder, but for different reasons. We review the district court's independent legal conclusions de novo. *See Rogers v. Gibson*, 173 F.3d 1278, 1282 (10th Cir. 1999).

First, the district court found that due process did not compel a second degree murder instruction in this case because it believed that "under Oklahoma law, second degree depraved mind murder is not a lesser included offense of first degree murder." *Taylor v. Sirmons*, 2007 WL 778043 at *27. This may have been an understandable interpretation of a confusing line of Oklahoma cases, but it was error. To be sure, *Beck* requires state trial courts to instruct juries only on

-18-

offenses that are considered lesser-included offenses of the charged crime as a matter of state law. *Hopkins v. Reeves*, 524 U.S. 88, 90–91 (1998); *see Turrentine v. Mullin*, 390 F.3d 1181, 1194 n.1 (10th Cir. 2004). Moreover, we have recognized that there existed a short window between 1997 and 1999 where Oklahoma did not recognize second degree depraved heart murder to be a lesser-included offense of first degree murder. *See Willingham v. Mullin*, 296 F.3d 917, 923 (10th Cir. 2002). As a result, had the OCCA denied Mr. Taylor's *Beck* claim during this period of time, relying on the ground that second degree murder was not a lesser-included offense of first degree murder, his petition for relief would fail even though second degree murder was a lesser included offense at the time of his trial. *See Willingham v. Mullin*, 296 F.3d at 922–26.

By the time the OCCA decided Mr. Taylor's *Beck* claim on direct appeal in 2000, however, second degree murder was again considered a lesser-included offense of first degree murder in Oklahoma. *See Shrum v. State*, 991 P.2d 1032, 1036 n.8 (Okla. Crim. App. 1999). Thus, both at the time of Mr. Taylor's trial and at the time of his direct appeal, second degree murder constituted a lesser-included offense of first degree murder in Oklahoma. In comparison, Mr. Willingham's *Beck* claim failed because his direct appeal occurred during the window in which second degree murder was not a lesser-included offense. *See Willingham v. Mullin*, 296 F.3d at 923. Because second degree murder was a lesser-included offense of first degree murder at each critical point in Mr.

-19-

Taylor's case history, he was entitled to a second degree murder instruction if it was warranted by the facts.

The district court's second reason for concluding that Mr. Taylor was not entitled to a second-degree murder instruction was based on a confusion between two different types of instruction. In addition to requesting a second-degree murder instruction based on his claimed lack of intent to kill Mr. Sauer, Mr. Taylor asked for and received a voluntary intoxication instruction based on his ingestion of methamphetamine and other substances shortly before the shootings. The district court seems to have understood this theory as an alternative basis on which Mr. Taylor was asserting a right to a lesser-included instruction. *See Taylor v. Sirmons*, No. CIV-01-252-JHP-KEW, 2007 WL 778043 at *27 (E.D. Okla. Mar. 12, 2007). Voluntary intoxication, however, is not a lesser-included offense of homicide; rather it is a perfect *defense* to first degree murder.[*****] The jury

---

[*****]Because voluntary intoxication is not a lesser-included offense of first degree murder, the fact that Mr. Taylor received a voluntary intoxication instruction at trial does not affect our analysis under *Beck* as to whether Mr. Taylor was entitled to a proper instruction on second degree murder. It is true that "under *Beck*, the trial court need only instruct on one lesser-included offense." *Spears v. Mullin*, 343 F.3d 1215, 1245 (10th Cir. 2003) (citing *Schad v. Arizona*, 501 U.S. 624, 647–48 (1991)). But when a jury is instructed only on first degree murder and voluntary intoxication, its choice remains limited to an "all-or-nothing choice between capital murder and innocence." *Schad*, 501 U.S. at 647 (citation omitted). Because the jury's acceptance of a voluntary intoxication defense in that case would be "equivalent to acquittal" of first degree murder, "[it] does not obviate the dilemma underlying the concerns of *Beck*." *Hogan*, 197 F.3d at 1305 (noting that provision of self-defense instruction does not satisfy requirements of *Beck*).

instruction on voluntary intoxication reflects this: "If you find that the state has failed to sustain [the burden of proving that the defendant formed the specific criminal intent required to commit first degree murder], by reason of the defendant's intoxication, then the defendant must be found *not guilty* of those crimes."  Jury Instruction 27 (emphasis added).

There is some confusion over whether Oklahoma law properly permitted a voluntary intoxication instruction in this case.  *See, e.g.*, Aplt. R. Br. 20 n.8; Aple. Br. 40–41.  The district court found that Mr. Taylor was not entitled to a voluntary intoxication instruction, because some Oklahoma cases have indicated that "where a criminal defendant is able to give a detailed lucid account of his criminal activity he is not [] entitled to a voluntary intoxication instruction."  *Taylor v. Sirmons*, No. CIV-01-252-JHP-KEW, 2007 WL 778043 at *27 (E.D. Okla. Mar. 12, 2007).  Nevertheless, even recognizing that an individual's state of intoxication might prove relevant to whether he acted with a "depraved mind in extreme disregard of human life," the question is academic in this case because Mr. Taylor does not rely on a voluntary intoxication theory as the sole rationale justifying a second degree murder instruction.  *See* Aplt. R. Br. 20 ("The defense scenario [second degree murder] is viable even without an intoxication defense.").  Both sides consistently agreed before the Oklahoma courts that defense counsel's strategy at trial did not focus on voluntary intoxication.  *See* Ev. Hear. Tr. IV at 72–73 (Feb. 23, 1999) (counsel for state arguing that "if the Court examines . . . the actual trial

transcript, the defense of voluntary intoxication was not what Mr. Elliot [defense trial counsel] was using."); *id.* at 13 (defense trial counsel testifies that he did not intend to raise the defense of voluntary intoxication as a defense). It is therefore immaterial for purposes of our *Beck* inquiry whether Mr. Taylor was entitled to an instruction based on a voluntary intoxication theory.

### C. Whether the facts warranted a proper second degree murder instruction

We next turn to the question *Beck* instructs us to ask: whether the evidence supported a second degree murder instruction, such that a jury could have rationally concluded that Mr. Taylor did not intend to kill Mr. Sauer. We find that there was sufficient evidence introduced at trial from which a jury could have rationally acquitted Mr. Taylor of first degree murder and convicted him of second degree murder.

In Oklahoma, homicide is second degree murder "[w]hen perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual." 21 Okl. St. Ann. § 701.8. A design to effect death is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed. 21 Okl. St. Ann. § 702. In addition, a design to effect death sufficient to constitute murder may be formed

instantly before committing the act by which it is carried into execution.  21 Okl. St. Ann. § 703.

The most direct evidence regarding Mr. Taylor's state of mind involved Steven and Lindsay Verner.  The prosecution introduced evidence that Mr. Taylor told his friend Steve Armstrong shortly before the incident that if Mr. Verner did not pay his drug debt he would need to "cap" Mr. Verner.  Moreover, the fact that Mr. Taylor's girlfriend was sitting in her car with the engine running while Mr. Taylor was inside supported the inference that Mr. Taylor had made plans for a speedy getaway.  There also was evidence that, prior to shooting Lindsay Verner Mr. Taylor said: "I hope you die, bitch."  There was no direct evidence regarding Mr. Taylor's state of mind toward Michael Sauer, the only person who died as a result of Mr. Taylor's shooting spree.  It is undisputed that Mr. Taylor did not know Mr. Sauer.  The prosecution's theory of the case was that after his premeditated shooting of Mr. Verner, Mr. Taylor shot the other three victims, including Mr. Sauer, in order to eliminate witnesses.  If believed by the jury, this would be sufficient to support a conviction for first degree murder of Mr. Sauer.

The focus of the defense to the first degree murder charge was the absence of any evidence that Mr. Taylor had a premeditated design to effect the death of Mr. Sauer.  Defense counsel articulated the theory in this passage from his closing argument to the jury:

> Most if not all of the evidence that has come from [the state] about Charles Taylor's intent to kill anybody is about his intent as it affects Steve Verner.
>
> The only problem with that is the only murder now filed is not about Steve Verner; it's about Michael Sauer. He doesn't even know Michael Sauer. There is no evidence—not a shred that he knew him; that he had any motive[;] that he had any reason to kill Michael Sauer[.]

Tr. III 692–93.

The only witness for the defense was Mr. Taylor himself. He testified that he shot Mr. Verner because "for some reason I don't know it scared me" when Mr. Verner reached out to put his arm around him. Tr. III 600. When he saw Mr. Verner fall to the floor and grab his face after being shot, Mr. Taylor testified that "it scared me. I didn't realize what had really happened at that point and—uh—flipped out and started to run out the door . . . ." *Id.* As to shooting Michael Sauer, he claimed that he "seen somebody out of the corner of [his] eye," didn't know who it was, but "fired shots in that direction." Tr. III 601. Mr. Taylor maintained this story on cross-examination. When the prosecutor asked Mr. Taylor whether he shot Michael Sauer, Adrienne Smith, and Lindsay Verner because he had thought that they might be able to report him, he responded "I don't think I was thinking at all." Tr. III 620.

In response to Mr. Taylor's account of the incident, the State notes that Mr. Sauer was shot twice in his back and argues that "[t]he fact that both bullets traveled a similar path through the victim's back suggests that Petitioner had not

traveled between the shots and therefore may have stood and shot the victim twice in a row." Aple. Br. 41. The State argues that if Mr. Taylor had paused, taken aim, and shot Michael Sauer twice in a row, this would cast doubt on Mr. Taylor's explanation of the shooting.

Accepting the factual findings of the state court and of the district court but reviewing their legal conclusions de novo, we conclude that the evidence would have allowed a jury to reasonably find that Mr. Taylor did not entertain a premeditated design to kill Michael Sauer. In reaching this conclusion, we begin with the fact that the trial judge, who was most intimately familiar with the evidence in the case and observed the demeanor of the witnesses, concluded that Mr. Taylor was entitled to a second-degree murder instruction (although unfortunately, the court delivered one that was not correct). This casts serious doubt on the State's argument that a reasonable jury, hearing the same evidence heard by the trial judge, could not have found Mr. Taylor guilty of second degree murder. For reasons already explained, the contrary conclusion reached by the OCCA is not entitled to deference. It is also significant that the prosecutor, who had every incentive to sniff out an implausible defense, made no objection at trial to the court's decision to give the second degree murder instruction. *See* Tr. III 644. This, too, casts doubt on the State's later argument, offered for the first time on appeal in the OCCA, that the evidence of intent at trial was so clear that a second degree murder instruction was unsupportable.

Turning now to the facts, we cannot agree with the State that the evidence regarding intent was so one-sided that a reasonable jury had no alternative but to conclude that Mr. Sauer's death was a product of premeditated design. If Mr. Taylor "did not aim as he shot, but the gun was just flailing around," as the OCCA summarized the defendant's testimony, *Taylor II*, 998 P.2d at 1229, it is hard to see why a second degree murder instruction would not be appropriate. Such behavior would be "imminently dangerous to another person," and it would "evinc[e] a depraved mind, regardless of human life," but it would not indicate any "premeditated design," 21 Okl. St. Ann. § 701.8, to kill Michael Sauer. Even if the jury believed that Mr. Taylor intentionally shot at Mr. Sauer—indeed, even if the jury believed that Mr. Taylor was intentionally seeking to *harm* him—it could have believed his testimony and concluded that Mr. Taylor had no intent *to kill* him. *See Quilliams v. State*, 779 P.2d 990 (Okla. Crim. App. 1989) (affirming second degree murder conviction where defendant testified his gunshots were intended to wound, but not to kill).

The OCCA has upheld second degree depraved mind murder convictions in a variety of cases in which the facts were similar to these, or arguably even more suggestive of an intent to kill. In *Dorsey v. State*, the OCCA upheld a second degree murder conviction where the defendant "intentionally armed himself with a knife and entered the store where he started a fight with the victim and intentionally stabbed him." 739 P.2d 528, 529 (Okla. Crim. App. 1987). In

-26-

*Quilliams v. State*, the OCCA upheld a second degree murder conviction where the defendant admitted "intentionally shooting [the victim]," but "denied an intent to do more than wound [the victim]." 779 P.2d 990, 991 (Okla. Crim. App. 1989). In both cases, the OCCA concluded that "a rational trier of fact could have found the essential elements of [second degree murder] beyond a reasonable doubt." *Dorsey*, 739 P.2d at 529; *Quilliams*, 779 P.2d at 991. *See also Hall v. State*, 698 P.2d 33 (Okla. Crim. App. 1985) (affirming second degree depraved mind murder conviction where victim was stabbed thirteen times in the chest and neck areas and sustained a large skull fracture); *Tucker v. State*, 675 P.2d 459 (Okla. Crim. App. 1984) (determining evidence supported second degree depraved mind murder conviction where five-month-old infant was battered by defendant with his fists and hands over two-day period and deliberately dropped to the floor).

We recognize the force of the State's argument that the similar paths of the two bullets through Mr. Sauer's back makes it less likely that Mr. Taylor shot him while running wildly through the apartment. While this may have been a legitimate argument for the prosecutor to make to the jury, however, it is not so self-evident a proposition as to compel the jury to disbelieve Mr. Taylor's testimony. Although the prosecution called numerous medical and law enforcement personnel to discuss the shootings, it never elicited any testimony on whether the bullet path evidence suggested, let alone conclusively established, that Mr. Taylor stopped, took aim, and shot Mr. Sauer in the manner the State now

-27-

hypothesizes. None of the state courts, nor the district court below, made any factual finding regarding the probabilities that the two shots could have been fired in rapid succession by someone running towards the front door of the house. A forensics investigation might well be able to draw a confident conclusion from this evidence, but as an appellate court we cannot. The evidence regarding the paths of the bullets does not provide us, therefore, with an unequivocal basis to conclude that Mr. Taylor intended to kill Mr. Sauer.

One additional consideration contributes to persuade us that a rational jury could have convicted Mr. Taylor of second degree murder. When Mr. Taylor argued at his evidentiary hearing on direct appeal that his trial counsel was constitutionally ineffective for failing to pursue a voluntary intoxication defense more vigorously, the State responded by claiming that defense counsel's strategy to focus on showing a lack of intent to kill Michael Sauer was "ingenious." Evid. Hr. IV 73. After describing the defense's theory that there was a "lack of specific intent, not because [Mr. Taylor was] intoxicated, but because [he] didn't know [Michael Sauer;] . . . had never met [him]," the State argued that this "factual avoidance [strategy] was a fairly good attack." *Id.* If this theory was sufficiently plausible to constitute sound trial strategy, it can scarcely be so flawed that a second degree murder instruction was unwarranted.

For all these reasons, we are persuaded that the evidence would have "allow[ed] a jury to rationally conclude" that the defendant did not intend to kill

Michael Sauer. Whether a jury was more likely to convict on first or second degree grounds is not the question. Due process demands that a jury be permitted to consider a lesser-included offense of first degree murder before imposing death so long as "the evidence would have supported such a verdict." *Beck*, 447 U.S. at 627; *see Hogan*, 197 F.3d at 1312. Here, if the jury accepted Mr. Taylor's account that he shot in the direction of Michael Sauer in a panicked withdrawal from Mr. Verner's home, without intent to kill, it could have validly convicted him of second degree murder. Thus, we conclude that a second degree depraved mind murder instruction was warranted based on the facts of Mr. Taylor's case.

**D.     Was the flawed lesser-included instruction harmless?**

If the defense had requested a second degree murder instruction and the trial court had denied it outright, it would be unnecessary to engage in harmless error analysis. "A *Beck* error can never be harmless." *Hogan*, 197 F.3d at 1312 n.13. Where, however, the trial court gives a lesser-included offense instruction but the instruction is flawed, the reviewing court must determine whether the error in the instruction "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). *See Turrentine v. Mullin*, 390 F.3d 1181, 1194 (10th Cir. 2004) (applying harmless error analysis to a flawed lesser-included offense instruction). The error in the instruction might be trivial or irrelevant to the particular case, such that the error could not have affected the jury's deliberations. The question in such cases, however, is not

whether a properly instructed jury would have been more likely to sentence the defendant to first degree murder or second degree murder. *Beck* makes clear that due process requires that a lesser-included instruction must be given where the evidence supports it, regardless of how powerfully the state presents the case for first degree murder. The question, instead, is whether the errant instruction had a "substantial and injurious effect or influence" on the jury's opportunity to consider a proper lesser-included instruction.

In this case, we are persuaded that the error in Mr. Taylor's second degree murder instruction was sufficiently material that it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623. The errant instruction directed the jury that it could not convict Mr. Taylor of second degree murder if it concluded that he intended to kill *or harm* Michael Sauer. This was prejudicial to Mr. Taylor because his defense centered on the argument that he did not have "the specific criminal intent *to kill* for Murder in the First Degree." Tr. III 696 (emphasis added). The defense did not deny that Mr. Taylor fired the gunshots that killed Michael Sauer or that he understood that firing a gun at someone would hurt him. In fact, Mr. Taylor responded in the affirmative when the state asked him on cross-examination whether he "kn[e]w that a gun [was] dangerous" and "whether he kn[e]w that when you shoot somebody it's going to *hurt* them." Tr. III 606 (emphasis added). Thus, the defense attempted to draw precisely the line that was effaced by the erroneous

-30-

instruction: that Mr. Taylor may have intended to harm Michael Sauer but did not intend to kill him.

Jurors are presumed to follow their instructions. *Zafiro v. United States*, 506 U.S. 534, 540–41 (1993). If the jurors in Mr. Taylor's case followed the instruction given on second degree depraved mind murder, they could quite logically have rejected a second degree murder verdict even if they fully accepted the defendant's theory of the case—concluding that even if Mr. Taylor did not mean to kill Michael Sauer, he nevertheless admitted shooting at him during his panicked withdrawal from Steven Verner's home, knowing this would inflict harm. Therefore, as in *Turrentine*:

> if the jury followed [its instructions], it would conclude that the defendant could "not" be convicted of second degree murder even if all the legal prerequisites for such a conviction were present. This is the equivalent of instructing the jury that no second degree murder alternative was available—that it was first degree murder or nothing.

*Turrentine*, 390 F.3d at 1193. This is precisely what the rule set out in *Beck* was designed to avoid. As the Supreme Court noted, "[w]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." *Beck*, 447 U.S. at 637. In this case, *defense counsel* explicitly told the jury that the defendant was guilty of second degree

murder. *See* Tr. III 697 (defense counsel in summation: "[Y]ou can't turn [Mr. Taylor] loose; [he has committed] murder in the second degree, no question about it."). If the jury was effectively made to choose between a capital conviction and acquitting a defendant whose counsel admitted that he committed homicide, the defendant surely faced the "substantial risk that . . . the jury [was] likely to resolve its doubts in favor of conviction." *Beck*, 447 U.S. at 634 (quoting *Keeble v. United States*, 412 U.S. 205, 212–13 (1973)). Accordingly, "[w]e cannot say that the availability of a third option"—here, a proper second degree depraved mind murder instruction—"could not have resulted in a different verdict." *Id.* As the Supreme Court concluded in *Beck*, "[s]uch a risk cannot be tolerated in a case in which the defendant's life is at stake." *Beck*, 447 U.S. at 637.

## III. Conclusion

For the reasons set forth above, we **REVERSE** the district court's decision denying Mr. Taylor's petition for a writ of habeas corpus. We **REMAND** the case to the district court with instructions to grant the writ as to Mr. Taylor's conviction and sentence for first degree murder, subject to the state's right to retry Mr. Taylor within a reasonable time. *See Fisher v. Gibson*, 282 F.3d 1283, 1311 (10th Cir. 2002).