2006 OK CR 17

**Wesley Deion JONES, Appellant**

v.

**STATE of Oklahoma, Appellee.**

No. D–2004–204.

Court of Criminal Appeals of Oklahoma.

April 24, 2006.

Sid Conway, Marna Franklin, Tulsa County Public Defender's Office, Tulsa, OK, attorneys for the defendant at trial.

Doug Drummond, William J. Musseman, Assistant District Attorneys, Tulsa, OK, attorneys for the State at trial.

Stuart Southerland, Tulsa County Public Defender's Office, Tulsa, OK, attorney for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Jennifer Dickson, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

## *OPINION*

CHAPEL, Presiding Judge.

¶ 1 Wesley Deion Jones was tried by jury and convicted of Count I: First Degree Murder (Mohamed Rahaman) in violation of 21 O.S.2001, § 701.7; and Count II: First Degree Murder (Sterling Mullis) in violation of 21 O.S.2001, § 701.7 in the District Court of Tulsa County Case No. CF–02–4910. The jury found two aggravating circumstances: (1) that during the commission of the murder, Jones knowingly created a great risk of death to more than one person and (2) that the murder was committed to prevent lawful arrest or prosecution.[1] In accordance with the jury's recommendation, the Honorable Thomas C. Gillert sentenced Jones to death on both counts. Jones has perfected this appeal.

### FACTS

¶ 2 A few days before September 15, 2002, Murtaza Ali and Shafi Ahmed asked Wesley Jones to kill the owner of the Lucky Trip convenience store, Mohamed Rahaman. On September 15th, Ali drove Jones to the store and identified Rahaman. Jones walked into the store, waited a few moments, then approached the counter and shot and killed Rahaman. When store customer Sterling Mullis, standing nearby, grabbed Jones, Jones also shot and killed him. Jones then fired through the glass door of the store and ran around the corner to Ali's waiting car and fled.

### FIRST STAGE ISSUES

¶ 3 In Proposition VI, Jones claims he gave an involuntary and thus inadmissible statement to police, and filed a pre-trial motion to suppress his statement. The trial court found that the statement was in fact freely and voluntarily given after proper *Miranda* warnings.

¶ 4 The evidence produced at a December 16, 2003 hearing shows that while Jones initially invoked his right to counsel, he reinitiated the interrogation after consulting with an attorney. The attorney consulted with Jones for approximately twenty-five minutes, after which he advised Jones and the Tulsa Police Officers that he would be representing Murtaza Ali and not Jones due to a conflict of interest. The attorney also told the Tulsa Police Officers that he had instructed Jones not to speak with them. Jones ignored the advice and reinitiated the interrogation.

¶ 5 Jones now claims that his statement was involuntary because the attorney knew he had a conflict of interest when he gave Jones legal advice. First, Jones waived this argument by failing to object at trial to the admission of the videotape. Second, no evidence suggests that the attorney's visit with Jones affected the voluntariness of his confession. Third, the totality of evidence at the hearing established that the statement was voluntary. Jones was properly *Mirandized* and reinitiated the interrogation. No evidence shows that he was coerced or intoxicated, and sufficient evidence supports the trial court's ruling that the statements were voluntary and admissible.[2] This Proposition is denied.

---

1. 21 O.S.2001, § 701.12.

2. *Le v. State,* 1997 OK CR 55, 947 P.2d 535, 542, *cert. denied,* 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998).

¶ 6 Jones claims the trial court committed reversible error in denying his requested "First Degree Manslaughter/With a Dangerous Weapon" instruction and in *sua sponte* failing to instruct upon Second Degree Murder for the murder of Sterling Mullis. (Jones does not dispute that he was not entitled to lesser-included instructions for the murder of Mohamed Rahaman.) Jones did not request this instruction at trial, waiving all but plain error. However, the trial court must instruct on any lesser-included offense warranted by the evidence. This Court has adopted the "evidence test" for trial court's use in determining when lesser-included instructions must be given.[3]

¶ 7 The First Degree Manslaughter/With a Dangerous Weapon instruction was not supported by the evidence. Jones walked into the convenience store with the intent to kill Rahamen. While doing so, he was grabbed by Mullis who was trying to prevent that murder. Jones then shot and killed Mullis. Jones contends that he was "scared" when Mullis grabbed him, causing him to act in the heat of passion. Heat of passion requires adequate provocation. Being "scared" after being grabbed while committing First Degree Murder does not suffice.[4] Jones was not entitled to a First Degree Manslaughter instruction. This argument is denied.

¶ 8 Likewise, the Second Degree Murder instruction was unsupported by the evidence. The essential difference between First and Second Degree Murder is intent to kill. First Degree Murder requires deliberate intent to end human life, which can be instantly formed and inferred from the fact of the killing.[5] Second Degree Murder re-

quires an eminently dangerous act, committed by one with a depraved mind.[6] It does not require intent to kill. A Second Degree Murder instruction demands evidence that the defendant did not intend to kill the victim. No such evidence exists. Jones was shooting Rahamen when Mullis grabbed him. Jones then shot Mullis in the neck at close range. The evidence supports the inference that Jones intended to kill Mullis. Thus, no Second Degree Murder instruction was warranted.[7] This Proposition is denied.

¶ 9 Jones argues in Proposition XVI that double jeopardy and 21 O.S.2001, § 11 were violated when the same evidence was used to support his conviction for First Degree Felony Murder in Count II and the aggravating circumstances found by the jury supporting the death penalty. It follows, he argues that his conviction for First Degree Felony Murder in Count II must be reversed. Jones concedes that the Supreme Court has rejected this argument[8] when it specifically found that the use of identical evidence to support both an element of the crime for which the defendant was convicted and an aggravating circumstance found by the jury at sentencing does not violate the Constitution.[9] We agree. This Proposition is denied.

### RESENTENCING ISSUES

¶ 10 Jones claims in Proposition III that the trial court erred in denying his for-cause challenges to Juror P. We review this claim through the following standards: the trial court holds discretion over whether

---

3. *Shrum v. State*, 1999 OK CR 41, 991 P.2d 1032, 1036 (lesser included instructions should be given if supported by any evidence).

4. Adequate provocation requires personal violence by the deceased likely to cause pain, bloodshed or bodily harm. *Washington v. State*, 989 P.2d 960, 968 (Okl.Cr.1999); *Young v. State*, 2000 OK CR 17, 12 P.3d 20, 39 (first degree manslaughter instruction not required where victim tried to defend himself).

5. *Young*, 12 P.3d at 39.

6. 21 O.S.2001, §§ 701.7 & 701.8

7. *Young*, 12 P.3d at 40 (second degree murder instruction not warranted where malice inferred based upon facts of case).

8. *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).

9. *Lowenfield*, 484 U.S. at 246, 108 S.Ct. 546; *see also Abshier v. State*, 2001 OK CR 13, 28 P.3d 579, 607–08 (use of same evidence to prove guilt and impose punishment does not offend double jeopardy),

to excuse a juror for cause,[10] but "all doubts regarding juror impartiality must be resolved in the defendant's favor." [11] In reviewing for bias, a juror must be excused for cause when his or her views substantially impair the performance of his or her duties as a juror.[12] Moreover, in a death penalty case, a juror must begin the trial with no "preconceived notions regarding the appropriate penalty, death or life" and must be able to "fairly" consider all punishment options.[13]

▇▇▇ ¶ 11 Jones argues that Juror P should have been excused for cause because she favored the death penalty. Although early in *voir dire* Juror P said that she could consider all three punishment options, she indicated that she had significant reservations about life imprisonment or life without parole. Juror P's reservations stem from prison overcrowding, incarceration costs, and her friendship with a crime victim's family member. Through that friendship, Juror P knew of a defendant who had been sentenced to death but had been retried numerous times, and still had not been executed after fifteen years. She also admitted to having always leaned "heavily" in favor of the death penalty. She stated that there might be a "rare" case that did not warrant the death penalty, but that she could not think of one. She then admitted that she would impose the death penalty if Jones were convicted of two counts of First Degree Murder as charged, and that she would not consider any other punishment option. This juror's overwhelming bias and her unwillingness to fairly con-

sider all three punishment options should have resulted in her being excused for cause.

▇▇▇ ¶ 12 In order to establish prejudice, Jones must show that due to the trial court's erroneous denial of a for cause challenge, he was forced to keep an unacceptable juror.[14] Jones excused Juror P with his fourth peremptory challenge. At the end of *voir dire*, Jones then renewed his objection to Juror P and requested an additional peremptory challenge to excuse Juror C. Juror C was unacceptable to Jones because she favored the death penalty and indicated on her questionnaire that there were only "rare" cases where it should not be imposed for murder. Juror C also felt sentences were not actually carried out, and had personal knowledge of a defendant who had been sentenced to death in 1967 but was still alive. Jones adequately established that Juror C was an undesirable and thus unacceptable juror. Since Juror P should have been excused for cause and Jones was prejudiced by not being allowed to exercise a peremptory challenge on Juror C, we must remand for resentencing.[15]

▇▇▇ ¶ 13 Jones contends in Proposition IV that the trial court impermissibly restricted his *voir dire*. During Juror P's *voir dire*, Jones asked if she would impose the death penalty if Jones was convicted of two counts of first degree murder. Juror P responded "Yes." Jones also asked if she would consider a punishment less than death if Jones was convicted of two counts of murder. Juror P

10. *Warner v. State*, 2001 OK CR 11, 29 P.3d 569, 572.

11. *Hanson v. State*, 2003 OK CR 12, 72 P.3d 40, 48.

12. *Warner*, 29 P.3d at 572.

13. *Id.* at 573–74.

14. *Hanson*, 72 P.3d at 48. This has long been the standard for determining prejudice in this context. *Warner*, 29 P.3d. at 573–74; *Powell v. State*, 1995 OK CR 37, 906 P.2d 765, 772, *cert. denied*, 517 U.S. 1144, 116 S.Ct. 1438, 134 L.Ed.2d 560; *Brown v. State*, 1987 OK CR 181, 743 P.2d 133, 139 and *Hawkins v. State*, 1986 OK CR 58, 717 P.2d 1156, 1158. However, as I noted in my dissent in *Grant v. State*, 2003 OK

CR 2, 58 P.3d 783, 810–11, this Court has incorrectly insinuated otherwise. The *Grant* court found that Grant was not entitled to relief in part because he did not prove "that the jury sitting in his trial was biased." *Grant*, 58 P.3d at 790; (relying on *Abshier v. State*, 2001 OK CR 13, 28 P.3d 579, 603–04), *cert. denied*, 535 U.S. 991, 122 S.Ct. 1548, 152 L.Ed.2d 472 (2002). However, as the above cases indicate, this has never been part of the standard to be applied when the trial court improperly denies a defendant's for cause challenge. It is limited to whether the defendant was forced to keep an unacceptable juror at trial because the trial court improperly denied the defendant's for cause challenge, thus denying the defendant a peremptory challenge. To the extent that *Grant* and *Abshier* conflict with this rule of law, they are hereby overruled.

15. See also Prop. IV.

responded "No." As discussed above, the trial court should then have excused Juror P for cause. Instead of immediately seeking to have her excused, trial counsel tried to re-ask the questions; the court sustained the State's objections to the questions.

¶ 14 We find that Jones's counsel was attempting to ask a valid question of Juror P: would she automatically impose the death penalty and not consider life imprisonment (either with or without the possibility of parole) if he was convicted as charged? Jones is entitled to ask this question. To prohibit it from being asked is reversible error.[16] A major purpose of *voir dire* in a capital case is to reveal whether jurors will consider all three punishment options equally.[17] A juror who cannot should be excused for cause.

¶ 15 The trial court ruled that the question was an impermissible hypothetical given its phrasing—Jones's conviction of two counts of murder instead of just "murder." But Jones *was* charged with two counts of murder. If the question is hypothetical, then all second stage *voir dire* suffers similar flaw in that questions are asked on the assumption of conviction. Every defendant should ask each juror about sentencing options and the juror's ability to impose the death penalty; to do otherwise would be inexcusable. The trial court erred in denying Jones his right to continue his *voir dire* of Juror P.

¶ 16 In Proposition II, Jones argues that individualized sequestered *voir dire* should be required in capital cases. We have previously rejected this argument and decline to adopt it now.[18] However, we urge trial courts to use a juror questionnaire and con-duct individual sequestered *voir dire* in capital cases.[19]

¶ 17 In Proposition XVIII, Jones argues that the aggravating circumstance verdict form used at trial was inadequate. Jones objected to the verdict form at trial and requested separate aggravating circumstance verdict forms for each count of murder. This request should have been granted. Instead, the trial court gave supplemental instruction 8A, which informed the jury that the murder to avoid arrest or prosecution aggravating circumstance applies only to Count II. While somewhat remedial, this instruction is not an adequate substitute for the easily-accomplished task of using separate verdict forms for each murder count. Trial courts should use separate aggravating circumstance verdict forms for each count of murder.

¶ 18 The single verdict form used in this case here lists two aggravating circumstances: (1) knowingly creating of a great risk of death to more than one person and (2) commission of murder to avoid lawful arrest or prosecution. The completed verdict form indicates that the jury found the existence of both aggravating circumstances beyond a reasonable doubt. However, instruction 8A informed the jury, and we presume the jury followed it,[20] that the second aggravating circumstance applied only to the murder in Count II. Thus, we know that the death verdict in Count II was supported by one aggravating circumstance (commission of murder to avoid lawful arrest or prosecution).

¶ 19 However, as a result of the single verdict form, we cannot determine

---

16. *Hanson,* 72 P.3d at 48.

17. *Id.*

18. *Childress v. State,* 2000 OK CR 10, 1 P.3d 1006, 1015–16 (individual *voir dire* discretionary with trial court).

19. We request the Committee for Uniform Criminal Jury Instructions to prepare a juror questionnaire for use in capital cases that elicits general information, such as name, address, employment, prior jury service, previous contacts with the legal system, and views on the death penalty. This list is illustrative not exhaustive and the committee is encouraged to prepare a comprehensive questionnaire that will garner relevant information from prospective capital jurors and correspondingly, assist the parties and the trial court in identifying potentially biased jurors. We encourage trial courts to use the completed questionnaire in all future capital cases. I would also require individual sequestered *voir dire* in all future cases.

20. *Ryder v. State,* 2004 OK CR 2, 83 P.3d 856, 875, *cert. denied,* 543 U.S. 886, 125 S.Ct. 215, 160 L.Ed.2d 146.

**157**

whether the great risk of death aggravating circumstance found by the jury applied to Count 1 or Count 2. A single verdict form, such as this one, supports the great risk aggravating circumstance's application to one of the two murder counts, but not both.[21] This Court cannot speculate as to which murder count this aggravating circumstance was intended to apply. Such speculation would be inappropriate in a death penalty case, where greater certainty is required. Thus, since this Court does not know which of the two counts this single verdict applies, the great risk aggravating circumstance cannot be applied to either count. As a result of this error and the errors above, the case must be reversed and remanded for resentencing to allow a jury to perform its task with proper verdict forms.

### Decision

¶ 20 The Judgments are **AFFIRMED** and the Sentences are **REVERSED and RE-MANDED** for resentencing. Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2006), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

C. JOHNSON, A. JOHNSON and LEWIS, JJ.: concur.

LUMPKIN, V.P.J.: concur in part/dissent in part.

LUMPKIN, V.P.J., concur in part/dissent in part.

¶ 1 While I agree with the Court's decision to affirm the judgments in this case, I dis-

agree with the decision to reverse and remand for resentencing and I disagree significantly with the Court's reasoning on four separate points.

¶ 2 First, I do not agree with Judge Chapel's "urge" for trial courts to "conduct individual sequestered *voir dire* in capital cases." While the language used indicates the issue is still discretionary with trial judges, the verb "urge" suggests that we are imploring trial judges to conduct individual sequestered *voir dire*. That is not the case. In actuality three judges of this Court find this issue to be purely discretionary. Oklahoma's Legislature, the entity charged with the responsibility for passing laws in this state, has not mandated individual sequestered *voir dire* in all capital cases, and neither should we.

¶ 3 Second, I part ways with the Opinion's analysis with respect to Juror P. A judge must be able to cut-off repetitive questioning, and this is what essentially occurred when the trial judge asked defense counsel to rephrase his hypothetical. I also believe the Opinion exaggerates the record when it states that Juror P. had an "overwhelming bias" and an "unwillingness to fairly consider all three punishment options". While Juror P. clearly favored the death penalty over the other two options, in theory, she expressed the practical need to know about a defendant's background before doing so. She also indicated she would not automatically impose the death penalty.[1] Also, she stated at least three separate times that she would consider

---

21.  [1] To find otherwise, would require this Court to make a judicial finding of the factual existence of this aggravating circumstance for the other murder count. Judicial findings of aggravating circumstances are constitutionally prohibited. *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (Any fact that increases punishment must be found by a jury after proof beyond a reasonable doubt). Cf. *Young v. State*, 1998 OK CR 62, 992 P.2d 332, 343–44, *cert. denied*, 528 U.S. 837, 120 S.Ct. 100, 145 L.Ed.2d 84 (1999)(finding based upon State's closing argument single verdict form supported application of all aggravating circumstances to all murder counts and setting aside one aggravating circumstance due to lack of notice).

1.  This fact is bolstered by Juror P.'s jury questionnaire, which indicated (1) she could imagine a circumstance when she would vote against the death penalty when someone has committed murder, and (2) she did not favor either side. This information must be considered dictum, however, because jury questionnaires are, in most circumstances (including this one), not part of the record on appeal. Most are sealed by the Court so as not to publicly disclose a juror's personal information. Thus, jury questionnaires are tools used by the attorneys to make a record during *voir dire*, and they do not, in and of themselves, create a basis for reversing a capital case when they are not admitted as part of the record. You must make your record in order to preserve error. If there is something in a questionnaire that an attorney believes brings into question the juror's ability to act in a fair and unbiased manner, it is incumbent upon them to

all three punishment options. Her knowledge of one defendant who had been sentenced to death yet retried several times over a fifteen-year period would seemingly make her less inclined to sentence a defendant to death, rather than the opposite.

¶ 4 And so, I find the issue of whether or not Juror P. should have been dismissed for cause, on the basis of actual bias, to be a close question.[2] While the record provides a more balanced set of facts relating to her qualifications, I would agree to resolve that close call in Appellant's favor and ultimately agree Juror P.'s views raised a question those views might have prevented or substantially impaired the performance of her duties as a juror in accordance with her instruction and her oath. *Rojem v. State,* 2006 OK CR 7, ¶ 32, 130 P.3d 287, 295. Furthermore, it cannot be fairly said that all doubts regarding her impartiality were resolved in Appellant's favor. *Id.* Thus, I agree the trial court abused its discretion in failing to dismiss Juror P. for cause, although I do not agree with the opinion's one-sided analysis of this issue.

¶ 5 Third, I find the Opinion's analysis of prejudice relating to Juror C. to be extremely misleading and legally insupportable. On appeal, this Court will not grant relief based on the improper denial of a challenge for cause unless the record affirmatively shows that the erroneous ruling reduced the number of the appellant's peremptory challenges to his prejudice, and he must demonstrate that he was forced, over objection, to keep an unacceptable juror. *Matthews v. State,* 2002 OK CR 16, ¶ 16, 45 P.3d 907, 915; *Warner v. State,* 2001 OK CR 11, ¶ 10, 29 P.3d 569, 573–74; *Powell v. State,* 1995 OK CR 37, ¶ 14, 906

P.2d 765, 772; *Hawkins v. State,* 1986 OK CR 58, ¶ 6, 717 P.2d 1156, 1158.

¶ 6 But what does the term "unacceptable juror" in this context mean? The phrase apparently came from *Hawkins v. State, supra.* In using the phrase, *Hawkins* cited to the **syllabus** of a case from the Supreme Court of Oklahoma Territory, circa 1899. The phrase "unacceptable juror" does not appear in the text (nor in any case to which the territorial case cites), although the case does discuss cause challenges for actual bias. Nevertheless, our cases have adopted the phrase "unacceptable juror" without clearly defining it.

¶ 7 The term "unacceptable juror" has, at times, been closely associated with the type of partiality that would cause a juror to be removed for cause. *See e.g., Grant v. State,* 2002 OK CR 36, ¶ 17, 58 P.3d 783, 790, *judgment vacated, Grant v. Oklahoma,* 540 U.S. 801, 124 S.Ct. 162, 157 L.Ed.2d 12, (2003)[3]; *Frederick v. State,* 2001 OK CR 34, ¶ 54, 37 P.3d 908, 927. But it has also been construed to mean a juror who is "undesirable to his position," whatever that means. *See e.g., Thompson v. State,* 1974 OK CR 15, ¶ 10, 519 P.2d 538, 541; *Cook v. State,* 1982 OK CR 131, 650 P.2d 863, 868. This second option is the one used in today's opinion.

¶ 8 But as pointed out in *Rojem,* "[t]he better road lies between these two extremes. For a criminal defendant will almost always be able to argue that a juror was somehow undesirable to the defendant's position, but to require that partiality to rise to the level of a cause challenge would render the statutory protection of the preemptive challenge virtually meaningless." *Rojem v. State,* 2006 OK CR 7, ¶ 37, n. 10, 130 P.3d at 295, n. 10.

raise the issue on the record, give the juror an opportunity to clarify any issues and the trial court an opportunity to rule on the issue. Otherwise, the issue is waived.

2. Under 22 O.S.2001, § 659, a juror exhibits actual bias by having a "state of mind ... in reference to the case, or to either party which satisfies the court, in the exercise of a sound discretion, that he cannot try the issue impartially, without prejudice to the substantial rights of the party challenging...."

3. By now, it should come as no surprise that the opinion, in 14, purports to overrule *Grant* and

*Abshier v. State,* 2001 OK CR 13, 28 P.3d 579, at least to the extent that they conflict with the weak "rule of law" this opinion now announces. I dissent to the Court's attempt to overrule cases that are accurate statements of the law and precedent of this Court. It is interesting that both cases received only one dissenting vote, Judge Chapel's. The problem, however, is that they were both authored by former Judge Lile, and some individuals seem to be on a mission to erase any evidence that Judge Lile rendered an opinion, good or bad, for the Court.

In other words, if all one has to do in order to establish prejudice in the denial of a cause challenge (as with Juror P.), is show some juror (Juror C.) served who might have been dismissed with a peremptory for virtually any reason, we have effectively guaranteed that every erroneous ruling on both cause and peremptory challenges will result in reversal. This boggles the legal mind, and should strike fear in all prosecutors, crime victims, legislators, and citizens in the state.

¶ 9 The Opinion states that Juror C. was "undesirable" for three reasons. First, she "favored the death penalty." But this reason is meaningless, for the great majority of death-qualified capital jurors could be described as favoring the death penalty (to varying degrees). Secondly, her juror questionnaire, which again is not even part of the record in this case, indicated "that there were only 'rare' cases where [the death penalty] should not be imposed for murder." However, this is a misrepresentation of the juror's position. In the questionnaire, Juror C. was given a printed list of statements and instructed to "circle the answer or answers that best correspond to your views on the death penalty." She circled the answer that read: "While I favor the death penalty, I do believe that there are rare cases where the death (sic) should not be imposed even if someone deliberately murdered another person." The word "rare" was not Juror C.'s— it was one on a preprinted form written by someone else. It could easily have been omitted from the sentence, and Juror C. might still have chosen that sentence as the one closest to her opinion. But, it wasn't. Juror C. was given a limited list of options and she had to choose one of them. She should not be judged completely by what the drafter of the questionnaire provided when the record is silent as to any amplification of the answer.

¶ 10 In reality, Juror C. was perfectly acceptable, one most criminal defendants would have no qualms about. In her questionnaire, she also stated: she was a moderate who admired Oprah Winfrey and Colin Powell; she did not believe in "an eye for an eye"; her views about the death penalty would not make it difficult for her to impose life without the possibility of parole or life *with* the possibility of parole; she would want to know more about the person and his background in order to determine the appropriate punishment; and that she could imagine a circumstance where, upon finding someone guilty of murder beyond a reasonable doubt, she could still vote against the death penalty. On a scale of 1 to 6 (1 meaning strongly oppose and 6 meaning strongly favor the death penalty), she chose a 4, thus indicating she was only slightly "in favor" of the death penalty.

¶ 11 And then, the Opinion's third stated reason for calling Ms. C. "undesirable" is that she felt sentences were not carried out and had personal knowledge of a defendant who had been sentenced to death in 1967 but was still alive. However, just as with Juror P., this actually stands as a reason not to impose the death penalty, rather than to select that punishment. Furthermore, these statements conflict with other statements Juror C. made indicating a belief that sentences are indeed carried out.

¶ 12 The point is that this was a very moderate juror, one who can in no way be described as unacceptable or even undesirable. She would be inside the circle of normal beliefs and opinions, where most jurors stand—not one of the one or two who clearly favor one side or the other.

¶ 13 Capital cases should not be reversed on a whim or on extra record material or on language that is so vague that no one knows what it means. I suggest, therefore, that we adopt the following definition: An "unacceptable juror" means that the record clearly shows that the juror in question: (1) actually sat on the jury; (2) voiced positions that plainly called into doubt the juror's ability to serve fairly; and (3) that any reasonable criminal defense attorney would have used a peremptory challenge to dismiss said juror. Using this definition, I would find Juror C. did not voice positions that "plainly called into doubt" her ability to serve fairly. Furthermore, many reasonable criminal defense attorneys would not hesitate to let Juror C. serve on their client's jury.

¶ 14 Finally, concerning the verdict form issue, I agree it is cleaner to have a separate verdict form for each murder count. Here,

however, based upon the written and verbal instructions given, the strength of the evidence, and the fact that jurors found the existence of both aggravators, I see no need to remand for resentencing and would therefore affirm the jury's sentence. It is obvious the murder to avoid arrest aggravator was applied only to count two, while the other aggravator, great risk of death to more than one person, was applied to both counts. I therefore dissent to the Court's decision to remand for a new resentencing in this case.

A. JOHNSON, Judge, concurs:

¶ 1 I concur in the opinion and write separately only in response to the position set forth in note 19.

¶ 2 There is no doubt that jury questionnaires and individual *voir dire,* when properly employed, are important tools in creating the right jury to decide a particular case. Certainly the use of those tools should be favored in all capital cases where a mistake is costly to remedy, if it can be remedied at all.

¶ 3 I believe, however, that the exact process of fitting a jury to a particular case is best left to the trial court and its consideration of the available venire on the one hand, and the circumstances of the case for trial on the other. I would not agree, therefore, that individual sequestered *voir dire* should be mandated in every capital case.