**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 26, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

STERLING B. WILLIAMS,

        Petitioner - Appellant,

   v.

ANITA TRAMMELL, Warden,
Oklahoma State Penitentiary,[*]

        Respondent - Appellee.

No. 11-5048
(D.C. No. 4:02-CV-00377-JHP-FHM)
(N.D. Oklahoma)

---

**ORDER AND JUDGMENT**[**]

---

Before **HARTZ, MURPHY, HOLMES**, Circuit Judges.

An Oklahoma jury convicted Applicant Sterling Williams of the

first-degree murder of LeAnna Hand and assault and battery with intent to kill her

roommate Elizabeth Hill. On the recommendation of the jury, Williams received

---

[*]Pursuant to Fed. R. App. 43(c)(2), Anita Trammell, who was appointed Warden of the Oklahoma State Penitentiary on February 28, 2013, is automatically substituted for Randall G. Workman as Respondent in this case.

[**]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

a sentence of death for the murder and 99 years' imprisonment for the assault and battery.

After unsuccessfully appealing to the Oklahoma Court of Criminal Appeals (OCCA), *see Williams v. State*, 22 P.3d 702, 733 (Okla. Crim. App. 2001), and unsuccessfully pursuing postconviction relief in state court, *see Williams v. State*, 31 P.3d 1046, 1054 (Okla. Crim. App. 2001), Williams filed an application for relief under 28 U.S.C. § 2254 in the United States District Court for the Northern District of Oklahoma. He claimed, among other things, that the trial court had violated *Beck v. Alabama*, 447 U.S. 625 (1980), by failing to instruct the jury on either of the lesser-included offenses of second-degree murder and first-degree manslaughter. The district court denied relief but granted a certificate of appealability (COA) on Williams's *Beck* claim. *See* 28 U.S.C. § 2253(c)(1)(A) (requiring a COA to appeal the denial of a § 2254 application). Williams obtained a COA from this court on two additional issues. He now appeals the district court's denial of relief (although limiting his *Beck* claims to his requested second-degree-murder instruction) and renews his request for a COA on additional issues.

We hold that Williams was entitled to an instruction on second-degree depraved-mind murder. Following this circuit's precedent in *Phillips v. Workman*, 604 F.3d 1202 (10th Cir. 2010), we decide that the OCCA applied a rule contrary to that set forth in *Beck*, and we therefore owe its decision no

-2-

deference under the Antiterrorism and Effective Death Penalty Act of 1996

(AEDPA).  And, again following our precedent, primarily *Phillips*, we hold that

the evidence would permit a rational jury to acquit Williams of first-degree

murder and convict him of second-degree murder.  Because our ruling on this

issue will require a new trial on the charge of first-degree murder, all other issues

that relate solely to that conviction are moot.  That leaves only Williams's request

for a COA on the claim that he received ineffective assistance of counsel at the

guilt phase, which we deny because reasonable jurists would not debate the

district court's resolution of the claim.

## I.    FACTUAL BACKGROUND

We begin with the OCCA's description of the pertinent events, as Williams

does not challenge that court's factual findings and we must presume them to be

correct, *see* 28 U.S.C. § 2254(e)(1):

> ¶ 2 . . . In May of 1997, [Williams] worked as an independent
> contractor for Willard Enterprises Colorado Choice Meat Company.
> He had sold [LeAnna] Hand meat on prior occasions.  On May 14,
> 1997, [Williams] phoned Hand and said he had some free meat he
> was going to give away and that he would bring it by her home.  At
> approximately 11:00 a.m., [Hand's roommate Elizabeth] Hill was in
> her room dressing when she heard a knock at the front door.  A
> moment later, she heard the answering machine on the telephone
> click on.  Hill picked up the phone in her bedroom and discovered
> Hand's mother on the line.  Hill spoke for just a moment, then she
> heard Hand call her name from the other room.  She opened her
> bedroom door and saw Hand struggling with [Williams].  Hill heard
> Hand fall to the floor and saw [Williams] standing over her body.
> Hill immediately shut her bedroom door and locked it.  She tried to
> call 9-1-1 but could not get an open phone line.  [Williams] then

-3-

kicked down her bedroom door and knocked the phone out of her hand. He told Hill to be quiet. Instead, she screamed and tried to run out of the room. She escaped from her room, but [Williams] tackled her in the hallway. He threw her to the ground, climbed on top of her, and put both hands around her neck. Despite [Williams's] attempts to choke Hill, she fought back and was able to free herself and run out of the front door of the duplex.

¶ 3 Hill was running to a neighbor's home when the manager of a nearby apartment complex, Carol Gorman, saw her and waved her over. Gorman observed bloody hand prints on Hill's neck. Meanwhile, as soon as Hill ran out of the duplex, [Williams] also left. He walked to his car parked in the driveway of the duplex and drove away.

¶ 4 The police arrived at the scene to find Hand dead in her living room. She had suffered a seven inch stab wound to her chest. The knife cut through her ribs, through a portion of her left lung, completely through her heart and into her right lung. The knife was still in her body, tangled in her clothes. Near the victim the police found a box from the Colorado Choice Meat Company, a roll of duct tape, a baseball cap with the company logo, and a pair of gloves. Nothing was missing from the duplex, including cash Hill had left on her bed.

¶ 5 On the same day, [Williams] phoned his employer and said he had just killed a girl and had to go to Chicago to hide out. [Williams] withdrew money from his back [sic] account. [Williams] also phoned his girlfriend, Consuela Drew, and told her he was going to jail. An all points bulletin was issued containing a description of [Williams's] car. The next day, May 15, 1997, Ms. Drew again spoke with [Williams] and told him to turn himself in to the police. That same day [Williams] was stopped by authorities in Alexandria, Louisiana. He had a serious cut to the index finger on his left hand, and scratches on his neck, face and chest. [Williams] cooperated with the officers and asked that the $121 dollars taken from him be given to his children.

¶ 6 A t-shirt retrieved from [Williams] later tested positive for Hand's DNA. The knife found at the murder scene was found to match a butcher block set of knives in [Williams's] home.

-4-

*Williams*, 22 P.3d at 708–09.

Williams presented no evidence at the guilt phase of his trial. Much of the OCCA's account of these events is taken from the testimony of Hill, the only person present in the home who testified at trial. Hill testified that she knew there was a struggle between Williams and Hand in part because she heard Hand call out her name in a distressed voice shortly before hearing a thump, which she believed to be Hand's body hitting the floor. Hill also provided details of her own confrontation with Williams after he tackled her in the hallway. She recalled that he placed both hands around her neck and squeezed hard enough that she could not breathe. But she did not remember whether she fought back or how she was able to escape. She testified that it was possible that Williams had let her go.

Further suggesting a struggle between Williams and Hand was the testimony of Dr. Robert L. Hemphill, the medical examiner who performed the autopsy on Hand. Dr. Hemphill testified that he observed "'defensive wounds'" on Hand, which, he explained, often occur when a victim "is trying to ward off blows being struck by a sharp instrument, [or] attempt[ing] to grab the hand that has the instrument in it or to grab the instrument itself." R., Vol. II (Tr. of Jury Trial Proceedings, Vol. IV at 769 (*State v. Williams*, No. CF-97-2385 (D. Okla. April 22, 1999) (internal quotation marks omitted)). He said that the fatal wound was caused by a knife that entered the left side of Hand's chest and was still entangled in Hand's clothing at the time of the examination; its blade measured

eight inches in length by one-and-three-quarters inches at its widest point.

Dr. Hemphill estimated that the knife wound was approximately six to seven

inches deep and was inflicted by a single, rapid thrust of considerable force.

Also, Mark Willard, Williams's employer at Colorado Choice Meat

Company, testified that he received a phone call from Williams shortly after the

events at the home of Hand and Hill. Williams told Willard he had "just killed a

girl" but did not provide any additional details. *Id.* at 806. According to Willard,

Williams "seemed very upset," *id.* at 807; he "sounded like he was crying" and

was "basically" sobbing, *id.* at 810.

## II.    DISCUSSION

### A.    Second-Degree Depraved-Mind Murder Instruction

#### 1.    Standard of Review

We first consider whether 28 U.S.C. § 2254(d) requires that we defer to the

OCCA's adjudication of Williams's *Beck* claim. Williams observes that

§ 2254(d)'s bar to habeas relief applies only to claims "adjudicated on the merits

in State court proceedings." He then argues, "Because neither the OCCA nor the

federal district court properly adjudicated this claim on the merits, there is no

finding to give deference to." Aplt. Br. at 18; *see Davis v. Workman*, 695 F.3d

1060, 1073 (10th Cir. 2012) ("Because there has been no state-court adjudication

on the merits of the claim, AEDPA's § 2254(d) does not apply."). We reject this

argument. "An adjudication on the merits occurs when the state court resolves

-6-

the case on substantive grounds, rather than procedural grounds." *Matthews v. Workman*, 577 F.3d 1175, 1180 (10th Cir. 2009) (internal quotation marks omitted). Williams presented his *Beck* claim to the OCCA, which rejected the claim not on procedural grounds, but on the substantive ground that the second-degree depraved-mind murder instruction was not warranted. *See Williams*, 22 P.3d at 712–14. Even if, as Williams asserts, the OCCA's substantive analysis "engaged in the wrong inquiry," Aplt. Br. at 17, it nevertheless constituted a rejection of his claim on the merits.

Because the OCCA adjudicated Williams's *Beck* claim on the merits, we are precluded from granting relief unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," *id.* § 2254(d)(2). Williams does not challenge the facts found by the OCCA. If, however, the OCCA reached a legal conclusion that was contrary to or involved an unreasonable application of *Beck*, we review de novo the issue of whether the state trial court should have instructed the jury on second-degree depraved-mind murder. *See Phillips*, 604 F.3d at 1213 (reviewing *Beck* claim de novo because OCCA applied legal standard contrary to *Beck*).

The Supreme Court has explained that the "contrary to" and "unreasonable application of" clauses of § 2254(d)(1) should be accorded independent meaning. *See Williams v. Taylor*, 529 U.S. 362, 404–05 (2000). A decision is contrary to Supreme Court precedent if (1) "the state court applies a rule that contradicts the governing law set forth in [the Court's] cases," or (2) "the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." *Id.* at 405–06. In contrast, a decision involves an unreasonable application of Supreme Court precedent if the "state-court decision . . . correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407–08. We now turn to whether the OCCA reached a decision that was contrary to or involved an unreasonable application of *Beck*.

Under *Beck*, "a sentence of death [may not] be constitutionally imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and *when the evidence would have supported such a verdict*." 447 U.S. at 627 (emphasis added) (internal quotation marks omitted). We have described the proper inquiry under *Beck* as follows:

> *Beck* requires a court to consider whether there is sufficient evidence to warrant instructing the jury on a lesser included offense, not whether there is sufficient evidence to warrant conviction on the greater offense. A *Beck* claim is not the functional equivalent of a challenge to the sufficiency of the evidence for conviction; rather,

-8-

> *Beck* focuses on the constitutionality of the procedures employed in the conviction of a defendant in a capital trial and is specifically concerned with the enhanced risk of an unwarranted capital conviction where the defendant's life is at stake and a reasonable jury could have convicted on a lesser included offense. Given these concerns, the sufficiency of the evidence of the greater offense is distinct from the *Beck* inquiry into whether the evidence might allow a jury to acquit a defendant of the greater of the offenses and convict him or her of the lesser.

*Hogan v. Gibson*, 197 F.3d 1297, 1305 (10th Cir. 1999) (citations omitted).

On three occasions we have held that the OCCA applied a rule that contradicts *Beck* because it focused on the sufficiency of evidence to support the *capital* offense instead of the sufficiency of evidence to support the *lesser-included* offense. *See Phillips*, 604 F.3d at 1211–13; *Taylor v. Workman*, 554 F.3d 879, 888 (10th Cir. 2009); *Hogan*, 197 F.3d at 1308–12. (We note that of these three, only *Hogan* predated the OCCA's decision in this case.) In *Hogan* the § 2254 applicant had killed the victim by stabbing her. *See* 197 F.3d at 1301. After testifying that the victim initially attacked him with a knife, he requested a first-degree manslaughter instruction, which the court denied. *See id.* at 1303. He was convicted of first-degree murder and sentenced to death. *See id.* at 1302. The OCCA affirmed the conviction and sentence, holding "that a manslaughter instruction was not necessary because there was sufficient evidence to support a finding of premeditation." *Id.* at 1305 (internal quotation marks omitted). We described the OCCA's reasoning as "squarely contrary to" and "a gross deviation from, and disregard for, the Court's rule in *Beck*." *Id.* at 1305. Although the

OCCA had "cited a standard consistent with *Beck*," the analysis that followed "*never* engag[ed] in the correct inquiry as to whether [the applicant] presented sufficient evidence to warrant a first-degree manslaughter instruction." *Id.* at 1306.

We identified the same error in *Taylor*. The applicant had shot and injured three people, then shot and killed another victim, but testimony supported the claim that he was merely flailing the gun around without aiming when he shot the victim who died. *See Taylor*, 554 F.3d at 882–83. The trial court submitted instructions on first-degree murder and second-degree murder, but the second-degree instruction was deficient because it improperly required that the defendant have no intent to harm any particular individual. *See id.* at 886. The OCCA held that this error was harmless because a second-degree instruction was unnecessary. *See id.* It reasoned that the "facts suggest a design to effect the death of [the victim] and *therefore* do not support a second degree murder instruction." *Id.* (internal quotation marks omitted). We ordered habeas relief. *See id.* at 894. We explained that the OCCA had committed "essentially the same" error as it had committed in *Hogan* when it failed to consider whether the jury could have convicted of second-degree murder, instead determining that the evidence supported first-degree murder. *Id.* at 887–88.

In *Phillips* the OCCA had again affirmed the trial court's refusal to give a second-degree murder instruction. *See* 604 F.3d at 1208. The § 2254 applicant

had stabbed the victim in the chest with a pocketknife, and the OCCA ruled that the evidence did not support an instruction on second-degree depraved-mind murder. *See id.* at 1207, 1211. We once more granted relief, because "[t]he OCCA's assessment of the lack of evidence supporting a second-degree murder instruction appears to be based largely on its view that the evidence *did* support [the applicant's] conviction for first-degree malice aforethought murder." *Id.* at 1212. We held that "[b]y relying upon the evidence that supported the conviction for first-degree murder, the OCCA committed the same error we identified in *Hogan* and *Taylor*" and therefore reached a decision that was contrary to *Beck*. *Id.* at 1213.

In this case the OCCA has repeated the error we identified in *Hogan*, *Taylor*, and *Phillips*. The court ruled that the evidence did not support a second-degree murder conviction. *See Williams*, 22 P.3d at 712. But it offered no explanation *why* the evidence did not support such a conviction, except that the evidence supported the first-degree conviction. Its analysis was as follows:

> ¶ 24 The evidence in the present case does not support the conclusion that [Williams] acted without any premeditated design to effect death. [Williams] took a butcher knife from his home, placed it in a box with a pair of gloves and a roll of duct tape and went to the deceased's home to meet her at the appointed time. [Williams] and the deceased had met previously and would recognize each other on sight. The deceased was stabbed within five minutes of [Williams's] arrival at her home. The butcher knife was driven approximately seven inches into the deceased's body. The ensuing wound was the result of a rapid, hard thrust of the knife into the body with only the handle of the knife visible. *This evidence is sufficient*

-11-

*for any rational trier of fact to find [Williams] acted with the premeditated intent to kill the deceased.*

¶ 25 [Williams] disputes the conclusion of premeditation and argues the evidence showed no reason for the victims to feel threatened when he entered their home, therefore there was no evidence to suggest that he formed the intent to kill in advance. Premeditation sufficient to constitute murder may be formed in an instant, or it may be formed instantaneously as the killing is being committed. It may be inferred from the fact of the killing, unless circumstances raise a reasonable doubt whether such design existed. *The evidence clearly supports a finding that when [Williams] stabbed the deceased, he did so with the intent to kill her, regardless of whether that intent was formed prior to or after arriving at her home. Accordingly, instructions on second degree depraved mind murder were not warranted, as that crime was not supported by the evidence.*

*Id.* (emphasis added) (citations omitted). Thus, the court ruled that an instruction on second-degree murder was not warranted *because* the evidence supported the conviction of first-degree murder.

The OCCA's analysis in this case is strikingly similar to its analysis in *Phillips*. In both cases the OCCA cited *Beck* and set forth the proper standard. Likewise, in both cases the OCCA made specific rulings that the evidence did not support the lesser-included second-degree-murder instruction. *Compare Williams*, 22 P.3d at 712 ("The evidence in the present case does not support the conclusion that [Williams] acted without any premeditated design to effect death."), *with Phillips v. State*, 989 P.2d 1017, 1035 (Okla. Crim. App. 1999) ("[T]he evidence in the present case did not support a second degree murder instruction."). But in this case, as in *Phillips*, the OCCA based these findings "largely on its view that

-12-

the evidence *did* support [the applicant's] conviction for first-degree malice

aforethought murder." 604 F.3d at 1212.[1] In affirming Williams's

_____

[1] The relevant paragraphs of the OCCA's opinion in *Phillips* read, in full:

¶ 58 Appellant further argues he was entitled to an instruction on second degree depraved mind murder under case law which states that the trial court is to instruct on every degree of homicide which the evidence tends to prove. A defendant is entitled to an instruction on every degree of homicide which is a lesser included offense of the primary charge and which is supported by the evidence. Here, second degree depraved mind murder was not a lesser included offense and *the evidence did not support the giving of an instruction on second degree murder*.

¶ 59 Murder in the second degree occurs when perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual. We have held that this statute is applicable where there is no premeditated intent to kill any particular person. Appellant argues that given the fact he stabbed the victim, only once, with a small pocket knife, and that he did so while he was angry with his father, a reasonable juror could have found that his acts were imminently dangerous and evinced a depraved mind but were committed without the design to effect death. Appellant specifically relies on testimony by the medical examiner that the type of wound suffered by the victim was survivable.

¶ 60 Appellant fails to note that the medical examiner testified that such a wound was survivable only if the victim got to a chest surgeon quickly enough. *As discussed in Proposition I, we find the evidence showed Appellant acted with the specific intent to effect the death of the victim. Therefore, the evidence does not support the giving of a jury instruction on second degree depraved mind murder, even if it were a lesser included offense.*

¶ 61 Appellant further argues he was entitled to the second degree depraved mind murder instruction as it was his theory of

(continued...)

-13-

conviction, the OCCA did not address whether evidence potentially supported a second-degree-murder instruction, but instead surveyed the evidence of intent to kill and simply observed that such intent "may be formed in an instant, or may be formed instantaneously as the killing is being committed." *Williams*, 22 P.3d at 712.

---

[1](...continued)
defense. However, a defendant is only entitled to an instruction on a theory of defense if that theory is supported by the evidence and is tenable as a matter of law. If there is no evidence in the record to support an instruction, it should not be given. As discussed above, the evidence did not support giving the instruction.

¶ 62 Finally, Appellant argues that by failing to instruct the jury on second degree murder, the trial court failed to provide the jury with the option of convicting him of a non-capital offense as required by *Beck v. Alabama*, 447 U.S. 625 (1980). This same argument was raised and rejected in *Valdez v. State*, 900 P.2d 363, 378–379 (Okl. Cr. 1995), *cert. denied*, 516 U.S. 967 (1995) wherein we stated:

> Neither *Beck v. Alabama* nor *Schad v. Arizona*, 501 U.S. 624 (1991) require that a jury in a capital case be given a third, non-capital option where the evidence absolutely does not support that option. The evidence in this case did not support a second degree murder instruction and the jury was thus properly precluded from considering that particular non-capital option.

¶ 63 Similarly, *the evidence in the present case did not support a second degree murder instruction*. Therefore, for the reasons discussed above, we find the trial court did not err in omitting an instruction on second degree depraved mind murder. This assignment of error is denied.

*Phillips v. State*, 989 P.2d 1017, 1034–35 (Okla. Crim. App. 1999) (emphasis added) (brackets, citations, and internal quotation marks omitted).

We cannot distinguish this case from our binding precedent. Accordingly, we do not defer to the OCCA's decision. We review de novo whether a second-degree depraved-mind murder instruction was required under *Beck*.

## 2. Merits

To recapitulate, *Beck* instructs that "a sentence of death constitutionally [may not] be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict[.]" 447 U.S. at 627 (internal quotation marks omitted). The *Beck* inquiry can be divided into two components. *See Phillips*, 604 F.3d at 1210. First, Williams "must establish that the crime on which the trial court refused to instruct was actually a lesser-included offense of the capital crime of which he was convicted." *Id.* That component is not controverted. It is undisputed that second-degree depraved-mind murder is a lesser-included offense of the capital offense of which Williams was convicted. As the OCCA observed in its opinion on Williams's direct appeal, "All lesser forms of homicide are necessarily included and instructions on lesser forms of homicide should be administered if they are supported by the evidence." *Williams*, 22 P.3d at 711 (brackets and internal quotation marks omitted).

Second, Williams "must show that the evidence presented at trial could permit a rational jury to find him guilty of the lesser included offense and acquit

-15-

him of first degree murder." *Phillips*, 604 F.3d at 1210 (internal quotation marks omitted). As we have explained, "*Beck* requires a court to consider whether there is sufficient evidence to warrant instructing the jury on a lesser included offense, not whether there is sufficient evidence to warrant conviction on the greater offense." *Hogan*, 197 F.3d at 1305 (citation omitted). Thus, "[o]ur question is not whether the evidence pointing to the lesser offense was weak" or "whether a jury was more likely to convict on first or second degree grounds." *Phillips*, 604 F.3d at 1213 (ellipses, brackets, and internal quotation marks omitted). Rather, "[d]ue process demands that a jury be permitted to consider a lesser-included offense of first-degree murder before imposing death so long as the evidence would have supported such a verdict." *Id.* (internal quotation marks omitted). We now turn to whether the evidence presented at Williams's trial would have supported a verdict of second-degree depraved-mind murder.

Second-degree depraved-mind murder is committed "[w]hen [a homicide is] perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual." Okla. Stat. tit. 21, § 701.8(1) (1976). As we explained in *Phillips*:

> The elements of second-degree depraved mind murder are: (1) the death of a human; (2) caused by conduct which was imminently dangerous to another person; (3) the conduct was that of the defendant; (4) the conduct evinced a depraved mind in extreme

-16-

disregard of human life; and (5) the conduct was not done with the intention of taking the life of any particular individual.

604 F.3d at 1211. Thus, a defendant may be convicted of this offense only if he lacked the premeditated intention of killing any particular person, *see Williams*, 22 P.3d at 712, and an instruction on the offense "demands evidence that the defendant did not intend to kill the victim," *Jones v. State*, 134 P.3d 150, 154 (Okla. Crim. App. 2006).

We hold that an instruction on second-degree depraved-mind murder was warranted because the evidence supported a conviction for that offense. We think our decision in *Phillips* controlling on the issue. The § 2254 applicant in that case had approached the victim at a gas station and stabbed him in the chest with a pocket knife without provocation after the victim had backed up and asked the applicant to leave him alone. *See* 604 F.3d at 1205. The force of the blow knocked the victim onto a nearby car. *See id.* The blade penetrated the victim's chest two to three inches deep, slicing a 1.2 centimeter incision in the anterior surface of his heart, and he bled to death at the scene. *See id.* at 1205, 1207. After the stabbing the applicant walked inside the convenience store, at which point the store clerk observed him become "'real emotional.'" *Id.* at 1214; *see id.* at 1205. He then left the store, walked past the victim (who was lying on the ground still conscious but unable to speak), and taunted the victim with a racial slur. *See id.* at 1205. Later the same day, the applicant expressed regret to a

-17-

bartender, repeatedly saying "'I'm sorry.'" *Id.* at 1214. The applicant presented no evidence during the guilt phase of trial, *see id.* at 1207, and the trial court refused his request to instruct the jury on second-degree murder, *see id.* at 1211.

Reviewing de novo the OCCA's decision affirming the trial court, we "conclude[d] that a jury could rationally find [the applicant] guilty of the lesser offense and acquit him of the greater." *Id.* at 1213–14. We explained that "the facts here show that [the applicant] may have been severely emotionally disturbed and raise doubts whether he had the requisite mental state for first-degree murder." *Id.* at 1213. We pointed to medical testimony that the knife wound could potentially have been survivable if treated quickly and that the more typical injury from such a wound "would be to a lung, which is more easily treated." *Id.* at 1214. We also noted evidence that the applicant became emotional and expressed regret shortly after the incident. *See id.* at 1214. The mere fact that the applicant had forcefully stabbed the victim in the chest was inadequate to conclusively negate an inference that he had not intended to kill the victim.

As in *Phillips*, here we have a confrontation with an unarmed victim, culminating in a single stab wound to the chest. In each case the fatal wound was inflicted by a forceful blow with a knife, which damaged the victim's heart and caused death within minutes. Moreover, in each case the assailant became emotional and expressed regret shortly after the killing. And both applicants presented no evidence at the guilt phase of trial but relied wholly on doubt raised

-18-

by the state's evidence of his mental state. In light of these similarities, our conclusion in *Phillips* compels the same conclusion here.

We recognize that the knife was bigger and the wound was deeper in this case than in *Phillips*. But the operative fact is the defendant's state of mind when he committed the homicide, not the depth of the fatal wound. *See Jones*, 134 P.3d at 154 ("The essential difference between First and Second Degree Murder is intent to kill."). We cannot say that the severity of the wound in this case, standing alone, is enough to distinguish this case from *Phillips*.

Indeed, an inference of an unintentional killing may be more reasonable here than in *Phillips*. First, eyewitnesses observed the assailant in *Phillips* approach the victim with a knife and forcefully shove him in the chest. *See* 604 F.3d at 1205, 1214. In contrast, no witness testified to seeing Williams stab Hand. Although the medical examiner opined that the knife was thrust forcefully into Hand, Hill testified that she heard a struggle, and a forceful movement with a knife could have occurred in that circumstance absent an intent to deal a fatal blow. Supporting this possibility is the evidence that whatever it was that Williams had planned, that is not what happened. He brought with him not only the knife but also duct tape and gloves that he never used. The struggle with Hand, which began promptly after his arrival at the duplex, was apparently

-19-

unforeseen.  Perhaps the knife was to be used to coerce Hand into something else.[2]

Williams's treatment of Hill also could suggest the absence of an intent to kill.  Although Hill testified that Williams placed both his hands around her neck and squeezed hard enough that she could not breathe, there is evidence that he relented and allowed her to go.  Hill said that she did not recall how she escaped and that Williams might have let her go.  And a neighbor testified that he saw Williams leave the duplex before Hill did, not what one would do if intent on eliminating the witness who remained inside.[3]

_____

[2] The dissenting opinion in the OCCA pointed out:

> Williams entered the victim's house with her consent, purportedly to deliver meat.  Indeed, his possession of a steak box containing a knife, gloves, and duct tape suggests an entry was prompted by criminal intent—Rape, Kidnapping or Murder.  The prosecution's theory was that he planned to rape the victim.  The evidence indicates that during Williams's struggle to subdue the victim, he fatally stabbed her once in the chest.  Did he intend to kill her?  Perhaps.  By contrast, his single stab could have been a defensive reaction to her struggle, intended to subdue her further, prevent his own injury, or facilitate his flight from the scene.

*Williams v. State*, 22 P.3d 702, 734 (Okla. Crim. App. 2001) (Chapel, J., dissenting) (footnote omitted).

[3] We need not quarrel with the OCCA's apparent factual findings that Hill "saw Hand struggling with [Williams]," that she "fought back and was able to free herself," or that, "as soon as Hill ran out of the duplex, [Williams] also left." *Williams v. State*, 22 P.3d 702, 708–09 (Okla. Crim. App. 2001).  Although we must presume the state court's *factual* findings to be correct, *see* 28 U.S.C. § 2254(e)(1), we are permitted in our de novo review of Williams's *Beck* claim to

(continued...)

Finally, the record in this case lacks the evidence of racial animus toward the victim that was presented in *Phillips*. *See* 604 F.3d at 1205.

The state cites *Bryson v. Ward*, 187 F.3d 1193, 1208 (10th Cir. 1999), as support for the proposition that evidence of intent may be so strong that an instruction on second-degree murder is inappropriate. But that case is easily distinguishable because of the evidence of planning. We wrote:

> The evidence overwhelmingly established that Bryson and Marilyn Plantz plotted to kill the victim for approximately one month prior to the murder. They contacted a number of people in an effort to get someone either to kill the victim or to help them carry out the murder. They also devised a variety of murder schemes and attempted to carry out several of those plans prior to the actual murder. The evidence, therefore, overwhelmingly establishes that this murder was intentional and premeditated.

*Id.* There was no such overwhelming evidence here.

Having identified an error under *Beck* in failing to allow the jury to consider the noncapital offense of second-degree depraved-mind murder, we must grant relief. When, as here, the defendant requested an instruction on the lesser offense, "[a] *Beck* error can never be harmless." *Taylor*, 554 F.3d at 893 (internal quotation marks omitted).

---

[3](...continued)
reach the *legal* determination that the evidence would have supported rational jury findings contrary to the state court's factual findings, *see Gilson v. Sirmons*, 520 F.3d 1196, 1234 (10th Cir. 2008) ("[A] state court's determination of whether the evidence presented at trial was sufficient under the *Beck* standard to justify a lesser-included instruction is not a finding of historical fact, but rather a legal determination reached after assessing a body of evidence in light of the elements of the alleged lesser-included offense.").

-21-

**B.  Ineffective Assistance of Counsel at Guilt Phase**

Our decision on the *Beck* issue moots all the claims for which Williams

seeks an expanded COA except one:  ineffectiveness of trial counsel in failing to

subject the state's case to meaningful adversarial testing at the guilt phase.  Were

Williams to prevail on this claim, he would be entitled to relief on his conviction

for assault and battery, which our ruling on the *Beck* issue leaves undisturbed.

We therefore consider whether the claim warrants a COA.  A COA will issue

"only if the applicant has made a substantial showing of the denial of a

constitutional right."  28 U.S.C. § 2253(c)(2).  This standard requires "a

demonstration that . . . includes showing that reasonable jurists could debate

whether (or, for that matter, agree that) the petition should have been resolved in

a different manner or that the issues presented were adequate to deserve

encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)

(internal quotation marks omitted).  Moreover, the OCCA rejected this claim on

the merits, *see Williams*, 22 P.3d at 728–30, and "AEDPA's deferential treatment

of state court decisions must be incorporated into our consideration of a habeas

petitioner's request for COA."  *Dockins v. Hines*, 374 F.3d 935, 938 (10th Cir.

2004).

To establish a claim of ineffective assistance of counsel, Williams had to

demonstrate that his counsel's performance fell below "an objective standard of

reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688 (1984), and "that

there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. Williams argues that his counsel failed to subject the state's case to meaningful adversary testing at the guilt phase, because (1) counsel's short opening statement "was nothing more than a general 'hello' and request to 'pay attention' to the evidence"; (2) counsel repeatedly referred to Hand's death as a "murder" during a cross-examination; (3) counsel effectively conceded guilt during his closing argument; and (4) counsel presented no guilt-phase evidence. Appellant's Mot. for Modification of COA at 10–11, *Williams v. Workman*, No. 11-5048 (10th Cir. May 26, 2011) (internal quotation marks omitted). He further contends that counsel's complete failure to subject the state's case to adversarial testing triggers a presumption of prejudice. *See United States v. Cronic*, 466 U.S. 648, 659 (1984) (no specific showing of prejudice necessary when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing").

The OCCA rejected this claim on the merits. In particular, it stated that defense "[c]ounsel's decision to limit his first stage opening statement and closing argument was a reasonable strategy decision to maintain credibility with jurors for sentencing." *Williams*, 22 P.3d at 730. The decision to limit closing argument made particular sense in light of the denial of a lesser-included-offense instruction on the murder charge. Conviction of first-degree murder was therefore almost inevitable, and focusing on sentencing was appropriate.

-23-

The district court ruled that the OCCA had reasonably applied the appropriate Supreme Court precedents. It explained that Williams is not entitled to the *Cronic* presumption of prejudice, because counsel had not conceded guilt and had "cross-examined the State's first stage witnesses, made objections to the State's evidence, and made opening and closing arguments." R., Vol. 2 at 309–10. And it further concluded that Williams had failed to demonstrate prejudice under *Strickland*, opining that in light of the overwhelming evidence of guilt, the challenged actions of counsel had unlikely altered the outcome of the guilt phase. No reasonable jurist would debate the court's determination that the OCCA's decision was not an unreasonable application of Supreme Court precedent. We therefore deny a COA.

## III. CONCLUSION

We REVERSE the district court's denial of Williams's application for a writ of habeas corpus on his conviction for first-degree murder and REMAND with instructions to conditionally grant the application, subject to the state's right to retry Williams within a reasonable time. We DENY Williams's request for an expanded COA.

ENTERED FOR THE COURT

Harris L Hartz
Circuit Judge